Estate of Henry J. Mollenberg, Harold J. Mollenberg and Richard H. Mollenberg, Executors v. Commissioner.
Estate of Henry J. Mollenberg v. Commissioner
Docket No. 10610.
United States Tax Court
1947 Tax Ct. Memo LEXIS 11; 6 T.C.M. (CCH) 1298; T.C.M. (RIA) 47332; December 23, 1947
Wentworth T. Durant, Esq., and John J. Flynn, Esq., 1414 Genesee Bldg., Buffalo 2, N.Y., for the petitioners. Harold D. Thomas, Esq., and J. Frost Walker, Jr., Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion This proceeding involves a deficiency in estate tax of $28,931.66. The deficiency resulted in part from the inclusion in the gross estate of the value of property which was transferred by the decedent to a trust during his lifetime. The parties have stipulated that the value of the trust property was $87,920.64 at the date of death. The sole issue is whether the Commissioner erred in determining that the value of *12 the trust property is includible in the gross estate under section 811(d) of the Internal Revenue Code. Findings of Fact The petitioners are the sons of the decedent and the executors under his will. He died a resident of Buffalo, New York, on July 11, 1943. He was survived by the petitioners and two daughters. The estate tax return was filed with the collector of internal revenue for the 28th district of New York. In 1910 the decedent and Jacob Betz organized the Mollenberg-Betz Machine Co., Inc. (hereinafter called the Company), under the laws of New York. The Company issued 100 shares of common stock which were owned half by the Betz family and half by the decedent individually until 1935. The Company was engaged in the operation of a machine shop in Buffalo and it had an agency for the sale and installation of refrigeration equipment which was manufactured by another company. Betz and his son (who married one of the decedent's daughters) had charge of the machine shop. The decedent and his sons had charge of the refrigeration business. The decedent was a self-made, practical man. He had not finished a public school education. When he started the refrigeration *13 business there was only one competitor in Buffalo. In 1930 there were ten or fifteen competitors. As competition increased more and more technical training was required by the salesmen of refrigeration equipment. Both of the decedent's sons were trained as engineers. They supplied the technical knowledge which was required in the business after 1930. The decedent was president of the Company. His annual salary was $15,000 in 1919 through 1931, $11,600 in 1932 through 1934, $12,000 in 1935 through 1938, $10,500 in 1939, $10,000 in 1940, and $9,500 in 1941 through 1943. Harold J. Mollenberg, the decedent's elder son, became associated with the Company in 1910. He was then attending high school and worked part time. During 1913 and 1914 he served a full time apprenticeship as a machinist for the Company. Then he attended college where he studied mechanical engineering. Since 1916 he has devoted his time exclusively to the Company's refrigeration business. In 1920 he had charge of the erection and installation of equipment and did all of the drafting work. About 1925 he became a salesman for the Company. He received an annual salary of $4,500 from 1920 to 1928, inclusive, $4,550 in *14 1939, $5,500 in 1940, $7,500 in 1941, and $10,500 in 1942 and 1943. He was married in 1926 and his living expenses increased thereafter. He became president of the Company upon the death of the decedent. Richard H. Mollenberg, the younger son, became associated with the Company through part time work before he attended college. He received a college degree in mechanical engineering, having specialized in refrigeration. He began to work for the Company on a full time basis about January 1928. He is engaged in the sale, engineering, and installation of refrigeration equipment. In 1930 or 1931 he made a single sale which would have given him more money on a commission basis than he received as salary. At one time he had received an offer from a competitor, but he turned it down without discussing the amount of compensation which he might receive. He received an annual salary which varied from $1,437 in 1928 to $3,030 in 1936. His annual salary was $3,640 in 1937 and 1938, $3,690 in 1939, $4,640 in 1940, $7,100 in 1941 and $10,100 in 1942 and 1943. He became vice-president of the Company upon the death of the decedent. The income, capital and surplus of the Company for the period 1930 *15 through 1943 were as follows: Capital and
Year
Income
Surplus
1930
* $ 1,574.22
$211,125.49
1931
* 5,944.23
204,142.06
1932
(15,044.62)
189,639.76
1933
5,012.03
(not shown)
1934
* (8,417.49)
188,532.09
1935
(1,574.40)
187,382.79
1936
24,571.54
188,213.65
1937
(3,668.98)
184,587.17
1938
(733.94)
183,853.23
1939
2,439.03
187,540.37
1940
18,402.88
197,912.56
1941
61,684.95
237,007.25
1942
22,904.01
213,817.96
1943
33,070.48
(not shown)
The decedent's wife died on October 12, 1930. Thereafter, the decedent lost interest in the Company's business and he began to work shorter hours. In 1931 he went to Europe with the American Society of Mechanical Engineers on a three-months' trip. His son, Harold, was in charge of the refrigeration business during his absence. After 1935 he devoted even less time to his work, which then consisted of selling, bill collecting, and office work. In 1936, 1937, and 1938, he took vacation cruises to the West Indies. He remained president of the Company until his death. On June 9, 1931, the decedent executed *16 his last will. He gave to each of his daughters a ten per cent share of his residuary estate. After the payment of those bequests he provided gifts of his stock in the Company for his sons in equal shares and made other provisions which are not material hereto. Both of the decedent's sons were dissatisfied with the amount of compensation which they received from the Company. They complained to the decedent frequently. His usual answer was that they would eventually own the business, so that they would get some more out of it at that time. He showed them a copy of his will. They told him that they wanted some guarantee that they would own his share of the business. They were concerned that he might change his will in such manner that the Betz family would gain control of the Company's stock. They were also concerned that he might make changes in his will if he married again. One day they told him that a friend of his had created a trust for the purpose of insuring that his business would be transferred to his sons. The decedent then said: "We will get this settled." Shortly thereafter he consulted an attorney. On December 28, 1935, the decedent transferred his 50 shares of the common *17 stock of the Company in trust under the provisions of an indenture which he executed as grantor and sole trustee. The indenture is incorporated herein by reference. It provided in part that the trust was to continue until the death of both of the decedent's sons, subject to a provision for the invasion of the principal which is set forth hereinafter. One-half of the income from the trust was to be paid to the decedent's son, Harold, and the other one-half was to be paid to his son, Richard. Upon the death of either son his share of income was to be paid to his issue, or in default of issue to his brother until the latter's death. Upon the death of both sons the principal was to be distributed one-half to the issue then living of each son, or in default of issue of either son to the other's issue, or if no issue were then living to the distributees then living of the decedent. The second article of the indenture provided as follows: "ARTICLE SECOND: (a) The Trustee is hereby authorized in his sole discretion to withdraw from the principal of the trust from time to time such sum or sums as he in his sole discretion may deem advisable and pay over the same to the aforesaid beneficiaries, *18 or any of them, and the judgment of the Trustee with respect thereto shall be binding and conclusive on all parties interested herein. "(b) In the event that the fair and reasonable value of the principal of the trust hereinbefore created at any time amounts to less than the sum of Ten thousand dollars ($10,000.00) or at any time the Trustee deems it for the best interests of the beneficiaries to discontinue the trust then such trust in the sole discretion of the Trustee may be terminated and the principal of said trust paid over to the beneficiary or beneficiaries then entitled to the income therefrom and the trust shall then and there terminate and the rights of any remainder interest or interests therein shall forthwith be extinguished and the judgment of the Trustee with respect thereto shall be binding and conclusive on all parties interested herein." Among the powers reserved in the third article of the indenture was the following: "* * * The Trustee is hereby empowered to determine, in his absolute discretion, whether or not money or property coming into his possession shall be treated as principal or income and the Trustee is further empowered to determine, in his absolute *19 discretion, whether or not expense, losses, the cost of alterations, repairs or improvements or any other disbursements shall be charged wholly against principal or wholly against income or partly against principal and partly against income and the judgment of the Trustee with respect thereto shall be binding and conclusive on all parties interested herein." The fourth article of the indenture provided in part as follows: "The trusts hereby created shall be deemed New York trusts and shall be governed in all respects by the laws of the State of New York. "This Indenture and the several trusts herein created shall be irrevocable. * * *
"The Trustee may in his sole discretion hold the trust estate or any part thereof as an undivided whole without separation as between the trusts hereby created but no such holdings shall defer the vesting of any estate in possession or otherwise according to the terms hereof." The decedent reported the transfer of his stock in trust as a gift on a gift tax return which he filed for 1935. He reported the value of the stock as $72,500. There was no consideration for the transfer within the meaning of section 811(d)(2) of the Internal Revenue Code *20 . The decedent made a gift in trust because he wanted to give his sons a greater interest in the business so that they would stay with the business, and also to provide a greater income for them and to provide for their children. The decedent showed his sons a copy of the trust indenture. They received income from the trust in 1936. Opinion LEMIRE, Judge: The question is whether the value of the property which the decedent transferred in trust during his lifetime is includible in his gross estate. The respondent relies upon section 811(d)(2) which requires that the value of such property be included in the gross estate where the enjoyment thereof was subject at the date of death to change through the exercise of a power by the decedent to "alter, amend, or revoke" the trust. An exception is made in the case of a "bona fide sale for an adequate and full consideration in money or money's worth." The petitioners contend that the decedent received adequate and full consideration, or at least partial consideration, for the creation of the trust. The essence of their argument is that the decedent parted with stock then valued at $72,500 in exchange for $85,000 in salary to which he *21 was not entitled. In support of that argument they say that he retained the services of his sons for the Company and that he made no contribution to the business after 1935. Neither premise is justified by the evidence. There is no evidence that the sons had any intention of resigning at any time or that the decedent had stopped working after 1935. The evidence is insufficient for us to say that he did not earn his salary. The evidence shows clearly, and we have found as a fact, that the decedent made a gift and not a sale of his stock. He had no contract with his sons. They made no promises to him of any sort. He filed a gift tax return. The petitioners argue that Edith M. Bense6, 35 B.T.A. 246, affirmed, 100 Fed. (2d) 639, is controlling. In that case the decedent entered into a contract with his son which provided an option to purchase stock at a fixed price. It was held that the consideration (measured at the time of the contract, rather than at the time the option was exercised) was full and adequate. There was no gift in that case. It would serve no useful purpose to refer to all of the cases cited by the petitioners. They are equally distinguishable. *22 The decedent reserved to himself, as trustee, the right to invade the principal of the trust "as he in his sole discretion may deem advisable and pay over the same to the aforesaid beneficiaries, or any of them." His judgment was to be final. If the principal of the trust at any time amounted to less than $10,000, it was provided that the trust "in the sole discretion of the Trustee may be terminated." The petitioners contend that those powers, which were in existence when the decedent died, apply only to the termination of the contingent remainder interests. They argue that the decedent's sons were unqualifiedly entitled to the income. The basis for that argument is the further contention that there was a separate trust for each son. That is not the situation before us, however. There was a single trust, created by a single indenture. We need not decide here whether separate trusts would come into existence upon the death of either son or whether the power of invasion would be restricted by that event. Both sons in fact survived the decedent. The respondent in his reply brief argues that the decedent had the power to withhold income under the third article of the indenture by *23 treating it as principal. However, the decedent had a broader power under the second article to invade all of the principal of the trust for the benefit of any beneficiary. That provision gave the decedent the power to deprive either son of his right to the income simply by invading the principal exclusively for the benefit of the other son. Thus, the decedent had at the date of death a power to terminate the trust under the provision hereinbefore discussed. He also had a power to change the enjoyment of the income beneficiaries as well as the remaindermen through the exercise of the power to invade the principal of the trust. We hold that the value of the whole trust property is includible in the decedent's gross estate under section 811(d)(2). Commissioner v. Estate of Holmes, 326 U.S. 480. Decision will be entered under Rule 50. Footnotes
*. Income taxes deducted: $3,401.80 in 1930, $393.70 in 1931, $809.27 in 1934.↩